# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

NO. 98-1358-CIV-ORL-18C

**OCALA WOMEN'S CENTER, INC.,**
a Florida corporation, and
**JAMES S. PENDERGRAFT, M.D.,**
on their own behalves and for the class of
patients, staff, and associated physicians,

**Plaintiffs,**

  -versus-

**INJUNCTION REQUESTED**

**CITY OF OCALA, FLORIDA,**
**MORREY DEEN, Chief of Police,**
**COUNTY OF MARION, FLORIDA,**

**CLASS ACTION RELIEF**

**JURY REQUESTED**

**HORACE "ED" DEAN, Sheriff,**
**KEN ERGLE, former Sheriff,**

**EDWARD JAMES MARTIN SR aka "ED MARTIN,"**
**MEREDITH TROTTER RANEY, JR,**
All individuals acting in concert, and or participating with,
any named Defendant, and all individuals having actual or
constructive notice of any injunctive order from this Court,

and **JOHN and JANE DOES I-X,** individuals and all other forms
& entities of defendants not yet known by name, participating
with any other named or unnamed defendant,

**Defendants.**

---

## COMPLAINT IN CIVIL ACTION FOR DECLARATORY JUDGMENT, INJUNCTIONS, ACTUAL-STATUTORY-EXEMPLARY DAMAGES, FORFEITURE OF PROPERTY USED, AND OTHER NECESSARY & APPROPRIATE RELIEF

---

Plaintiffs Ocala Women's Center and Dr. Pendergraft [hereafter "OWC" refers to all interests asserted and persons represented by "OWC" and or Dr. Pendergraft] bring this civil action for declaratory and injunctive relief, costs & fees, and other appropriate relief, and state their complaint respectfully as follows:

## I. JURISDICTION & VENUE

1. This federal district court has jurisdiction and may grant relief under the Civil Rights Acts, 28 USC §1343; FACE, 18 USC §248 et seq; and FDPPA, 18 USC §2721 et seq.

2. There is further jurisdiction under the Federal Question statute, 28 USC §1331, the Federal Supplemental Jurisdiction Statute, 28 USC §1367, and the U.S. and Florida Constitutions.

3. The matter in controversy exceeds any and all jurisdictional value limitations, and is greater than $75,000 exclusive of costs and interest.

4. No state judicial or administrative proceedings are pending material to any of the controversies herein.

5. Any pendent or supplemental state law questions are secondary to and intertwined with the predominant federal questions.

6. Relief is also authorized by FACE, FDPPA, 42 USC §§1983-1988, and the Federal Rules of Civil Procedure.

7. OWC maintains its principal place of business in the Middle District of Florida. Chief operating officer is co-plaintiff Dr James S Pendergraft, M.D., working primarily out of Orlando, Florida. Dr Pendergraft has sent and received, from his office in Orlando, the principal communications material to these related and overlapping controversies.

8.   A substantial proportion of the events and omissions underlying the claims in this case transpired within the Orlando Division of this Court, wherein at least one defendant is domiciled.

9.   Here in Orlando Dr Pendergraft received the denials of police and sheriff security protection under the off-duty programs. The activities of Ed Martin, Meredith Raney, and their class impact Dr. Pendergraft in Orlando in a significant way.

10.   It is from Orlando that payments for security protection services and other extraordinary security measures are authorized and made.

11.   Key witnesses in this matter also are situated in Orlando. OWC physicians work primarily in Orlando. They go up to Ocala from Orlando on surgery days, often with the necessity of armed guards.

12.   OWC security is further coordinated from Orlando, and that subject is the essence of this case.

13.  OWC and Dr. Pendergraft have full constitutional standing to assert the *jus tertii* liberty and privacy rights of third parties involved in seeking and providing reproductive health care services. These include patients, physicians, staff, employees, service people, vendors, visitors, invitees, and independent contractors.

14.  All of the above classes of individuals are adversely affected, damaged, and injured in similar and serious ways by each and every defendants' interrelated and overlapping negligent, reckless, wanton, outrageous, and otherwise tortious acts.

15. The classes of plaintiff individuals are regularly harassed, shadowed, and surveilled by the hostile and aggressive Ed Martin group, without adequate protection, when they enter and leave OWC premises. Martin and his group monitor, photograph, and videotape patients, doctors, and staff. They even videotape lawyers' and architects', faces and license plates, for future insidious, unlawful, and otherwise tortious purposes, such as the Abortion Holocaust Web Page of "Abortionists and their Accomplices." (That is one of the Web Sites being investigated by the FBI. On that site is a "hit list" of reproductive health care providers and associates. Lines are drawn through the names after the designated individuals are shot or wounded. The site targets not only clinicians, but a few members of the Supreme Court. See
http://www.christiangallery.com/atrocity/aborts.html).).

16.  The City of Ocala allows Ed Martin and his confederates to camp out all day with a van, video cameras, and multiple anti-abortion accessories right on the side street grassy knoll area directly across from the OWC clinic side entrance, just feet from entering patients and staff, just inches from imminent confrontation.

17.  Said patients and staff reasonably expect a higher degree of protection and privacy from what they perceive as a potentially dangerous and overly intrusive group of excessively loud and screaming extremists determined to interfere with their medical care and constitutional rights. The Martin group of harassers refuses to identify themselves to anyone but uniformed law enforcement, and are named as DOE's here by default.

18. All defendants may be found and served within the Middle District of this Court.

19. The most mutually convenient venue for filing papers, witnesses, hearings, and trial is in the Middle District, Orlando Division.

20.  Defendants Martin and Raney and their confederates in particular have been active all over Florida and the Middle District, with arrests and contempt citations in Melbourne, for example. Defendant Raney resides in Melbourne within the Orlando Division and has been an active confederate of Martin for almost a decade in conspiring to harass OWC and Dr Pendergraft, as well as the two reproductive health care facilities in Orlando

owned by the doctor. Raney is well known to this Court in Case No. 97-1197-CV, currently pending on similar issues.

21.   The acts and omissions of the different categories of defendants are so interrelated and intertwined that this case should best proceed as one civil action in one Court to avoid substantial repetition of evidence and to conserve valuable judicial time.

22. Similar actions seeking FACE and FDPPA injunctive relief for a Melbourne clinic are already before this Court, involving Mr Raney as well, who is tortiously active statewide.

23. Another similar and necessary action by the Orlando Women's Center in Orlando will be filed after this case, because of similar harassment of Dr. Pendergraft's two reproductive health care facilities in Orlando.

## II. THE FACTS

24.   As historical fact and background, in 1972 the State of Florida, through its legislature, sanctioned medically supervised pregnancy terminations in clinics and hospitals. This was all pre-*Roe* legislation by the people of Florida.

25.   That legislation was twenty-six years ago, prior to and independent of Roe v. Wade, 410 US 113 (1973), and Doe v Bolton, 410 US 179 (1973).

26. The 1972 Florida law was relieved by this Circuit of some of its unduly burdensome restrictions in cases leading up to Poe v. Gerstein, 517 F2d 787 (5th Cir. 1975-Fla), affirmed, 428 US 901 (1976)(same counsel as here).

27. Independent of *Roe/Doe*, the Florida Constitution and Florida Supreme Court have also developed an impressive body of jurisprudence on a state constitutional right of privacy. This encompasses medically safe reproductive health care including abortions for adult women and minors, as in In re T.W., 551 So2d 1186 (Fla 1989).

28. Safe and legal medically supervised reproductive health services have been the public, judicial, and legislative policy of the State of Florida, if not Ocala, for a quarter of a century. The alternative as history teaches is dangerous back-alley non-medical abortions.

29.     Unsafe, dangerous, and degrading circumstances for abortion are also the alternative when clinics and doctors are unprotected, harassed, intimidated, and threatened out of business by extreme zealots, shooters (Pensacola, twice), and arsonists (Ocala, twice).

30. Many women throughout the centuries have chosen, and will continue to choose not to continue their pregnancies. They have hundreds of personal and private reasons. Their acts are a natural supplement to the miscarriage process. Their reasons are none of the business of politicians, nor of fundamentalist

harassers such as Ed Martin, Meredith Raney, and their confederates.

31. Florida law, the Florida Constitution, and state statutes/regulations were fortified on the subject of abortion under both the Due Process and Equal Protection clauses of the U.S. Constitution in *Roe* and in Doe v Bolton, 410 US 179 (1973), as reaffirmed repeatedly through Planned Parenthood v. Casey, 505 US 833 (1992).

32. In Florida, and Ocala, an outpatient medical facility providing reproductive health services, including abortion, is a fully lawful entity, as much as or moreso than any other hospital, clinic, or physician's office.

33. Such a facility, as OWC, is entitled fully to the Equal Protection of the laws, including public services, police protection, and judicial injunctive protection from intimidation, threats, obstruction, harassment, and arson.

34. Prior Ocala reproductive health care facilities were twice destroyed by arson.

35. Those "unsolved" torchings were followed by celebratory rallies, not unlike Klan gatherings, where Ed Martin was prominent.

36. Those arsonists of the first clinic are presumably at large and unrepentant today, as the crimes were not prosecuted by the

Ocala and Marion County authorities in the last nine years.

37.  Such dangerous, violent, criminal, and tortious acts are encouraged and incited by the actions of defendants Martin and Raney, their confederates, and the inaction of the City and County defendants.

38. Dr Pendergraft is a highly qualified board-certified ob/gyn specialist, trained in Tampa, and working primarily out of Orlando.

39. In July 1998 Dr Pendergraft opened the Ocala Women's Center to provide private and safe women's health care in the Ocala vicinity, so that area women would not need to travel so far in the future.

40. From the 1989 arsons until 1998, women in the Ocala area had to travel long, burdensome distances for medical care choices, to Orlando and further away.

41. This travel causes stress and delay. It is a medically unnecessary obstacle course, damaging to the physical and mental health of patients.

42.  The existing harassing atmosphere contributed to by all defendants also causes unnecessary physical and emotional damage, and creates an explosive atmosphere conducive to aggressive lawlessness by the Ed Martin/Meredith Raney groups, and their confederates, some of whom are wanderers in an

extremist fundamentalist underground of clinic harassers and worse.

43. **Extra security and protection for patients, staff, and physicians are expensive and important concerns for plaintiff OWC. These have been made particularly necessary by the acts and omissions of all defendants, individually and in concert. OWC has had to become a veritable fortress with guards, investigators, and too many security cameras to count.**

44. **Unpredictable fundamentalist anti-abortion harassers are known to be very active, devious, and potentially dangerous in Florida generally, and in mid-Florida particularly.**

45. **Arson, bombings, chemical attacks, blockades, unwanted following & contact, intrusive surveillance, copying & videotaping of license plates by strangers, other intimidation, stalking, nuisance activities, trespass, interference with business & good will, and multiple varieties of privacy invasion have occurred systematically nationwide in proximity to the activities of zealous extreme fundamentalist anti-abortion harassers, such as defendants Martin, Raney, and their confederates.**

46. **Much of the foregoing activity could be prevented or restrained by an ongoing police presence, such as paid off-duty police or sheriff's officers in uniform, as well as appropriate injunctions carefully tailored to stop wrongful conduct and activities.**

47.  Private security is inadequate and ignored in practice by fundamentalist harassers.

48. Police and sheriff departments are trained in recognizing, preventing and prosecuting the kinds of harassment, and worse, reasonably to be anticipated from anti-abortion zealots and other more dangerous persons attracted by extremist fundamentalists, such as defendants Martin and Raney.

49. Such harassers routinely shout, yell, and scream, calling doctors and staff murderers, butchers, baby killers, and unborn holocaust promoters. This encourages even more extreme fundamentalists with skills in arson, chemistry, electronics, bomb making, and rifle marksmanship.

50. Police training and police business generally include a certain skilled ability to deal with these kinds of foreseeable security problems. Police work is all about preventing and dealing with adversity and confrontations.

51. Ocala Women's Center (OWC) needs help in preventing such risks and perils. This is essentially physical protection, and physical and mental security for a large class of women patients and those associated with them as companions, escorts, clinic staff, physicians, employees, service people, and independent contractors.

52. Plaintiff OWC and Dr Pendergraft are ready, willing, and able to pay for normal off-duty security protection in the form of

"special duty" uniformed police officers and/or "special detail" uniformed sheriff's department officers, in the same manner as provided to other Ocala area organizations.

53. This is basically extra PAID work for off-duty officers to make extra money from private part-time employers such as Dr Pendergraft and the Ocala Women's Center. This is NOT a government gratuity, but rather is a city and county controlled monopoly.

54. P. Ex. 1 to this Complaint is the "Special Duty Assignment" order of the City of Ocala police. It allows in a nondiscriminatory manner "[a]ny person, firm or organization, desiring the services" of an officer for "Special Duty" to request and obtain same in a routine way.

55. The police "Order" on its face has no exclusionary provision for any particular kind of duty, nor any mechanism or non discretionary standards for abandoning a particular applicant on the basis of gender, fundamental right, race, religion, political orientation, or any other characteristic of the applicant or duty assignment.

56. Dr Pendergraft, from Orlando, on 8 July 1998, requested a special duty off-duty officer assignment for paid part-time work at the Ocala Womens Center, 108 NW Pine Ave, Ocala.

57. Defendant Morrey Deen, Ocala Chief of Police, responded with P. Ex. 2 two days later, denying any obligation to allow off-

duty assignments that might involve "adversarial circumstances," which he did not explain or define.

58. "Adversarial circumstances" is an expression of boundlessly vague parameters that could be an excuse for all seasons and reasons, to justify any form of denial, discrimination or idiosyncrasy of the particular Chief in charge.

59. Chief Deen did not, moreover, mention the "Special Duty Assignment" Order 235. [P.Ex.1]. The Order sets out procedures and policies for such assignments that are in fact a routine accommodation for Ocala businesses and organizations of which the Chief approves.

60. Chief Deen did not explain the City policies or customs at that time for allowing or prohibiting off-duty work by officers, nor did he even disclose Order 235, which OWC found later. He just said "No."

61. Plaintiff Ocala Womens Center also requested off-duty protection from the Marion County Sheriff's Department in a letter dated July 29, 1998. P. Ex. 5 to this Complaint.

62. The applicable "Operations Procedure" for Sheriff "Special Detail" assignments is P. Ex. 7. It contains no geographical limitations against City assignments. It does not discriminate against any particular kind of assignment.

63. County Sheriff Patrol Division Commander, Major Woody

Guess, denied the OWC request for deputy sheriff off-duty paid protection, without explanation, in a letter dated August 4, 1998. P. Ex. 6.

64. Dr Pendergraft subsequently sent more detailed, reasoned requests to the City of Ocala and then County Sheriff, defendant Ken Ergle, outlining justifications for allowing off-duty officers to work part-time at the Center. E.g., P. Ex. 3, 4, 5.

65. The foregoing and continuing requests have met with summary, dismissive denials by the City Police Chief and the then-Sheriff himself, defendant Ken Ergle, now ex-sheriff.

66. The then-Sheriff additionally claimed there to be an unwritten policy of not permitting off-duty deputy sheriff assignments within the Ocala city limits.

67. He did not elaborate on such a policy's rationale, origin, history, or applicability to instances of city police unavailability or unwillingness, as is the case here.

68. Nor did the Sheriff disclose then that regular off-duty assignments were in fact often made to numerous activities with in-city addresses, such as weekend late night billiard parlor duty on the same street as plaintiff Ocala Women's Center, several blocks away.

69. On information and belief, off-duty work is allowed at the billiard parlor because it is a "guy thing," whereas female and

reproductive health care are not a "guy thing."

70. Subsequent efforts by plaintiffs to reason with defendants on the basis of need, law, justice, privacy, security, even-handedness, precedent, crime prevention, their own regulations, the opportunities for off-duty officers to save for the kids' college tuition, and more, have been to no avail, so this lawsuit followed.

71. The Sheriff's office eventually willingly provided OWC with a list of the then most recent 100 prior off duty assignments. That list reveals in-City assignments nearby, such as the billiard clinic or pool hall facility. It reveals assignments which are arguably much more, as well as, much less adversarial than security work at OWC.

72. The City and police chief, however, have declined for months to provide any information on prior off-duty police practices. Excuses have varied, but included a demand for substantial monetary pre-payment, recurring filing clerk illnesses, a misunderstanding of the requests, and lengthy learned dissertations on the nature, purposes, and functioning of the public records desk. To date that has meant *no information*, a total stonewall.

73. The police have rebuffed perhaps a half-dozen efforts by women employed at OWC simply to inspect relevant police public files and find out about the off-duty work program.

74. The reasons behind this curiosity-raising concealment and

74. The reasons behind this curiosity-raising concealment and continuing delay remain obscure, and will perhaps emerge in discovery.

75. The policies and practices in question in this lawsuit are officially authorized, supported, and sanctioned by the governing bodies of the City of Ocala and County of Marion, respectively. Their application is under color of state law within the meaning of 42 USC §1983.

76. These policies unreasonably place OWC at risk of numerous perils and liabilities, and have already been the proximate and contributing cause of damages and injuries sustained by OWC, and adverse physical & mental consequences and damages to those whose interests OWC has standing to represent, individually and as classes.

77. On good information and belief, the questioned policies are based on the government defendants' insistence upon unchallenged, unbridled control and discretion over all off-duty police and deputy sheriff work, even the paid voluntary assignments at issue here, without considering the primacy of well-settled constitutional limitations and risks to clearly established constitutional and statutory rights.

78. On good information and belief, off duty law enforcement officers could and would maintain a safe and peaceful environment in the OWC vicinity, if allowed by the government defendants to take on such part-time work.

79.   The absence of police or sheriff off-duty protection substantially increases the probability of further danger and damage to OWC and those associated with it. It is much easier for an arsonist or shooter to case the facility when trained law enforcement people are almost never around.

80.   Co-defendant Edward James Martin Sr [hereafter "Ed Martin" or, for brevity "Martin"], Meredith Raney, and the class of those they guide & influence, are the inextricably intertwined other side of this metaphorical "coin" and lawsuit. They are the self-appointed fundamentalist private surveillance team that stalks, watches and monitors OWC and other reproductive health patients, staff, and their vehicles daily, without a scintilla of consent, authority, or legitimate basis.

81.   Martin resides in and owns property & vehicles in Ocala. He uses said property & vehicles in his negligent, reckless, wanton, outrageous, and otherwise tortious activity against OWC.

82.   Martin and Raney have engaged in numerous anti-abortion activities of harassment, intimidation, law breaking, and injunction-ignoring all over Florida and the Middle District, including Orlando, Gainesville, Tampa, Melbourne, and elsewhere.

83.   Martin, Raney, and their confederates are the principal reason that OWC needs injunctive relief and further compensation for numerous forms of suffering, damage, and extraordinary security measures, proximately caused and

required by the negligent, reckless, and otherwise tortious acts and omissions of the defendants, and each of them.

84. Martin was a named defendant and subject to the East-Central Florida injunctions arising out of Madsen v WHC, 512 US 753 (1994). Raney was not at that time personally named, but was convicted of contempt for violating the same injunction in concert with Martin and others. At least one Raney conviction was upheld, and certiorari denied by the Supreme Court, so he is collaterally estopped from denying future applications of that order.

85. Martin and Raney both have numerous arrests and convictions for activities of a trespassing, privacy-invading, harassing, obstructive, intimidating, and stalking nature.

86. Martin describes himself as a "pastor for the unborn," an imaginary self-ordained position for which he has no physical "church" or other facility as such. He has boasted of driving around the country for some time with three fetuses that he named, and engaging in other bizarre and unpredictable activities.

87. Martin and Raney both appear in fact to be full time, otherwise unemployed, harassers of reproductive health care facilities. Neither has any known medical or para-medical training, certification, licensure, or qualifications.

88.  Martin has continuously and regularly since the opening of the Ocala Womens Center engaged with numerous others in multiple forms of negligent, reckless, outrageous, and tortious harassment, intimidation, threatening behavior, obstructive behavior, imaging of license plates, videotaping of individuals and their vehicles, surveillance of individuals, and other insidious activities against OWC not presently fully known.

89.  Said acts and omissions have caused substantial and irreparable damage to OWC et al in physical and mental suffering, invasions of security, liberty, and privacy, infliction of physical suffering and emotional distress, loss of good will, reputation, and patients.

90.  Because of this ongoing hostile surveillance, harassment, and other acts of Martin and his confederates, prospective OWC patients and others are regularly intimidated, threatened, and damaged, both physically and emotionally.

91.  Some patients and others come partially disguised, or in rental or loaned vehicles, to protect their safety and security from stalking, and their lives from unwanted, unpredictable intrusions.

92.  Many additional patients feel compelled to travel to other cities or delay their medical care, to avoid harassment, surveillance, and unwanted contact with Martin and his unwanted group of loud, unpredictable extremists.

93.    Said activities of Martin and confederates have necessitated and caused extraordinary security expenses by OWC, and physically & emotionally stressful alteration of living patterns by all OWC associates.

94.  Some valuable OWC employees have quit, and others have expressed that quitting was on their minds, because of the harassing and threatening activities of Martin, and the reasonable fear engendered thereby.

95.    Extra security precautions must be taken by OWC physicians and staff, for arriving and departing at OWC, especially because there is no off-duty police or sheriff protection at those critical, vulnerable times when clinic obstruction is at its worst.

96.   The side street, driveways, and vehicles entering and leaving have been obstructed, and threats made, by members of the Martin entourage on a regular and recurring basis. One poignant event recently was one unknown harasser yelling: "Watch the doctor run in. He thinks someone is going to shoot him" [paraphrased]. This was around the time of the Buffalo, NY, shooting, by a suspect with known connections to the Florida anti-abortion extremist underground.

97.  Mr Martin and his followers often crowd the sidewalks and side street with distractions, such as carriages, dolls with ketchup, and very large, bloodily morbid signs. On many mornings Martin arrives early in one of his vans or his RV camper. He sets up a stroller with a doll inside, one or more

signs, and a baby car seat, right next to busy Pine Avenue beside a fire hydrant. This is mere feet from a busy boulevard that is in fact three concurrent US highways of interstate commerce.

98.  The totality of raucous Martin-led activities are both a health and security hazard to patients and passers-by. Sidewalk signs, noise, and distractions have contributed to about seven traffic accidents since OWC opened. Drivers say they are startled by the distracting, bizarre "wacko signs" and seemingly occupied, unattended baby carriages dangerously close to the busy highway.

99. Participants with Martin often bring along small children against their will. At a large recent event organized by Martin after church on a hot day, no water was provided for children or adults, although an ambulance was on standby, and police were parked in the neighborhood under a "JESUS SAVES" sign.

100. Meredith Trotter Raney, Jr, is a co-conspirator with Ed Martin in their extremist fundamentalist enterprise of negligent, reckless, wanton, outrageous and otherwise tortious activities against OWC, Dr Pendergraft, and the Orlando clinics as well.

101.  Raney and Martin regularly plot and plan in concert for fundamentalist actions against the OWC class of facilities, patients, doctors, staff, and others. During a recent time period, Raney and Martin spent over 300 minutes together in telephone and FAX time, committing and planning presently unknown activities and overt acts, inter alia.

102.  Raney has a long history of harassing Dr Pendergraft all the way back to the doctor's medical school fellowship days at Tampa General, when Raney tried to get him removed from the fellowship program after tracking him through license plates and stalking.

103.  Recently, Raney was a principal organizer of mid-1998 activities in Orlando by "Operation Rescue" against clinics, Barnes & Nobles, and Walt Disney World. These included activities and overt acts against Dr Pendergraft and his Orlando reproductive health care facilities.

104. The usual police community patrol in the OWC vicinity is wholly inadequate to control the Martin group when they suddenly and aggressively act out. 911 response is always too little too late. The City is fully aware of this inadequacy and need. Uniformed off-duty police on site during surgery days are vitally necessary both for prevention and, when necessary, detention.

105.  Private security is inadequate because the anti-abortion harassers have a lawless article of "faith." They never obey private security. They only obey police when present, but only until they turn their backs. For example, the Martin group has been comparatively tame in December because OWC associates were nearby watching for repetition of the outrageous October and November harassment and obstruction.

106.  The daily situation outside OWC is volatile, hostile, and potentially, indeed probably explosive. Carefully tailored injunctive relief, as suggested below, is a necessary and wise preventive measure, but only this federal court can make it happen.

### III. IRREPARABLE INJURIES AND DAMAGES

107. The federal statutory and constitutional violations underlying these claims render the related injuries to patients, physicians, and staff irreparable per se. The statutes include the Civil Rights Acts, 42 USC §§1983-1986, FACE, 18 USC §248, and FDPPA, 18 USC §2721.

108.  Undue burdens on access to reproductive health care are irreparable injury per se to OWC, and to those it has standing to represent. They are specifically and seriously harmed daily by the obstacle course of harassment and intimidation erected by the Martin group.

109.  Invasions of personal safety, security, and privacy, such as involved here, have dangerous and irreparable consequences that can only be prevented and mitigated by firmly enforced injunctive relief from this Court, and a regular law enforcement presence for a period of time.

110.  Numerous forms of physical and emotional damage are suffered by the plaintiff class as a proximate consequence of the negligent, reckless, wanton, intended, outrageous   and otherwise  tortious  acts  and  omissions  of  defendants,  each

member of their class, and those acting in concert or participation with them.

111.  These damages and injuries include but are not limited to intrusions on physical security & safety, intrusions upon personal liberty & privacy, physical & mental suffering, emotional distress, and other losses of personal and property interests.

## IV. <u>BURDEN ON STATUTORY & CONSTITUTIONAL RIGHTS</u>

112.  The negligent, reckless, wanton, intended, and otherwise tortious acts and omissions of defendants have unreasonably burdened access to and delivery of reproductive health care services at OWC and by Dr. Pendergraft and other physicians.

113.  Reproductive health & medical services are protected to a high degree by federal and state statutes, laws, judicial precedent, and both Federal and State Constitutions, more than any other health care services, and for good reason.

114.  The multi-faceted siege of OWC by the Martin class of defendants in particular has negligently, recklessly, and otherwise tortiously interfered with peaceful, lawful, reproductive health care services, and has threatened, intimidated, and obstructed the delivery of such services at OWC, as well as the safety, security, and privacy of the plaintiff classes.

115.  The surveillance, videotaping, and copying of license plate information capable of identifying persons entering and

leaving OWC has negligently, recklessly, wantonly, and otherwise tortiously resulted in a potential "blackmail database" of vehicle and licensee personal information which poses a continuing threat to the plaintiff classes.

116.   The foregoing acts and omissions of defendants unreasonably burden and damage the lawful rights and interests of OWC, patients, physicians, staff, employees, invitees, and independent contractors who come and go at OWC.

117.  Said acts and omissions cause fear and intimidation and create a reasonable apprehension of danger to physical safety and security, in that Martin and confederates gather information that can lead them to any patient's front or back door in the middle of the night, with just with a phone call to confederate Meredith Raney, of which there have been a great many.

## V. PUBLIC INTEREST AND POLICY

118.   The constitutional & statutory law of Florida favor the unimpeded access of citizens to reproductive health care services. "[T]he State has a strong interest in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy." Rehnquist, C.J., in Madsen v WHC, 512 US 753 (1994)(p 12 of opinion).

119. Constitutional & statutory law of the United States favor the unimpeded access of citizens to reproductive health care services. Id; Roe v Wade, 410 US 113 (1973); Doe v Bolton, 410

US 179 (1973); FACE, 18 USC §248; FDPPA, 18 USC §2721.

120.    Federal and state law disfavor and often criminalize the harassment, obstruction, and unreasonable intimidation of persons entering and leaving health care facilities. "[T]argeted picketing of a hospital or clinic threatens not only the psychological, but the physical well-being of the patient held 'captive' by medical circumstance." Rehnquist, C.J., in Madsen v WHC, 512 US 753 (1994)(p 12 of opinion).

121.    Federal and state law further disfavor discriminatory denial of public services, such as police protection, to a constitutionally protected group, class, or activity.

## VI. NO QUALIFIED IMMUNITY

122.    The police and sheriff defendants have no qualified immunity for denial of off-duty security assignments to OWC.

123.    The applicable constitutional law of equal protection and due process is clearly established at a sufficient level of generality that the government defendants reasonably know or should know that their acts and omissions lack legitimate justification and cannot withstand constitutional analysis or scrutiny.

124.  The government defendants are accordingly, through their insurers, liable for their tortious acts and omissions.

## VII. HIGH PROBABILITY OF SUCCESS ON MERITS

125.     The OWC claims which follow have a sound and substantial base in constitutional, statutory, and federal & state common law.

126.     Applicable Supreme Court and Eleventh Circuit decisions point clearly in favor of the full relief requested by OWC and those whose rights OWC and Dr. Pendergraft may assert.

## VIII. CLAIMS FOR RELIEF

127.     Plaintiffs Ocala Womens Center (OWC) and Dr. Pendergraft re-allege and incorporate by reference the foregoing allegations, and state the following counts and claims for relief:

### Count I: Equal Protection & Civil Rights Violations by City & County

128.     The negligent, reckless, wanton, intended, and otherwise tortious acts and omissions of the city and county defendants have deprived OWC of the Equal Protection of the Laws guaranteed against state action by the Fourteenth Amendment, and have further violated the Civil Rights Acts, 42 USC §§1983-1986.

### Count II: Due Process Violations by City & County

129. The negligent, reckless, wanton, intended, and otherwise tortious acts and omissions of the city and county defendants have deprived OWC of the rights of liberty, security, property,

and privacy guaranteed by the Due Process Clause of the Fourteenth Amendment against state action, and have further violated the Civil Rights Acts, 42 USC §§1983-1986.

## Count III: Multiple Invasions of Federal & State Privacy Rights

130.  The negligent, reckless, wanton, intended, and otherwise tortious acts and omissions of defendants have caused multiple irreparable and severely damaging invasions of the federal and state security, safety, liberty, and privacy rights of plaintiff OWC and associated individuals.

## Count IV: Infliction of Emotional Distress

131.  The negligent, reckless, wanton, intended, outrageous, and otherwise tortious acts and omissions of defendants have caused substantial and severe emotional distress with physical manifestations and substantial foreseeable damages to plaintiff OWC and associated individuals.

## Count V: Interference With Business & Professional Relationships

132.  The negligent, reckless, wanton, intended, and otherwise tortious acts and omissions of defendants have unreasonably interfered with numerous business and professional relationships among OWC, physicians, staff, patients, invitees, and others.

133.  Said interferences have caused serious, substantial, painful, and irreparable injury and damage.

## Count VI: Interference With Business & Professional Reputation & Good Will

134.  The negligent, reckless, wanton, intended, and otherwise tortious acts and omissions of defendants have unreasonably interfered in numerous ways with and caused immeasurable damage to the business and professional reputation and good will of OWC.

## Count VII: Civil Conspiracy & Concert of Action

135.  The negligent, reckless, wanton, intended, outrageous, and otherwise tortious acts and omissions of the defendants have been pursuant to and in furtherance of a tortious civil conspiracy and concert of action in which each participant has played one or more varying and contributing material role.

136.  Said civil conspiracy has caused substantial physical, emotional, and property damage to OWC and individuals associated with OWC.

## Count VIII: Multiple FACE Violations by Martin/Raney Et Al

137.  The negligent, reckless, wanton, intended, outrageous, and otherwise tortious acts and omissions of the defendants, have attempted to injure, intimidate, and interfere with OWC, because OWC was seeking to, or obtaining, or providing, reproductive health care services at the OWC facility. Said acts of defendants constitute multiple violations of FACE.

138.  The negligent, reckless, wanton, intended, and otherwise tortious acts and omissions of the defendants have damaged and

attempted to damage the property of OWC, because OWC was seeking to, or obtaining, or providing, reproductive health care services at the OWC facility. Said acts of defendants constitute multiple violations of FACE.

139.  OWC has been seriously damaged, injured, and aggrieved by the acts and omissions of the defendants. Said acts were directed at OWC, because OWC was involved in seeking to obtain or provide services in the OWC reproductive health facility.

140.  The defendants have attempted to and in fact restricted freedom of movement in and out of OWC, delayed and rendered impassable ingress and egress, and repeatedly placed those associated with OWC in reasonable apprehension of bodily harm to themselves and others.

### Count IX: Multiple FDPPA Violations by Certain Defendants

141. The negligent, reckless, wanton, intended, and otherwise tortious acts and omissions of the defendants threaten unreasonably, unnecessarily, and recklessly to disclose personal information about those associated with OWC that can be derived from motor vehicle and/or drivers license records based on surreptitious copying of plates by defendants and their confederates.

142.  Said disclosures are not necessary for, nor related to, motor vehicle or public safety, nor can they be based on knowing and informed written consent of drivers, passengers, or invitees

associated with OWC who strongly object to such unconsented and unwanted invasions of security and privacy.

143.   Nor are such disclosures and dissemination allowable under any excepting provision of FDPPA section 2721(b)(1)-(14), 18 US Code, nor for any other lawful purpose.

144.   The disclosures and disseminations complained of and anticipated occur in part because of careless and reckless state agency practices in making unconsented open sales of private informational details on vehicle driver lists, without providing adequate notice or opt out for vehicle owners, and without providing any protection whatever for non-owner drivers and passengers.

145.   Individuals in Florida are required to register their vehicles and become licensed to drive, but no individuals consent thereby to have their names, addresses, and other personal information splashed in effect across a public billboard that can be viewed and copied by any voyeur, stalker, rapist, burglar, potential killer, shooter, prison inmate, or other dangerous person.

146.   OWC and threatened individuals who drive in and out of the OWC parking areas are irreparably injured and damaged by the foregoing acts and omissions. None of these individuals has an adequate opportunity, means, or notice to prevent release and unlawful use of this information against them, nor to stop the compilation of a "blackmail database" by Martin, Raney, and their

confederates to be used against them.

147.  The public interest favors protection of private personal information from potential stalkers and abusers, over the practice by State DMVs and computer database entities of profiting from the unrestrained sale of such information to individuals such as Martin, Raney, and their confederates.

## Count X: Exemplary Damages

148. Certain reckless misconduct and omissions by defendants have been sufficiently reckless, wanton, outrageous, inhumane, insensitive, and malicious to warrant substantial exemplary damage awards against each such individual.

149.  Said exemplary damage awards should be made sufficient to deter forever each defendant, and punish and prevent said defendant, from continuing the misconduct at issue, directly or indirectly, in any form, long into the future.

150. Defendants such as Ed Martin and Meredith Raney who have worked only at harassment for these many years should be ordered to work using their real world skills to satisfy the foregoing requested judgments and break loose from their patterns of unlawful, tortious, and irrational behavior.

## IX. TRIAL BY JURY REQUESTED

151.  Counterclaim plaintiffs request trial by jury on each issue of fact and damages as would be required under the

common law and the usual practice of this Court.

## X. RELIEF AND JUDGMENTS REQUESTED

152.  WHEREFORE, OWC respectfully urges this Court to grant and order the following, as well as other necessary and appropriate relief:

### GOVERNMENT INJUNCTIONS

(1) Preliminary and permanent injunctions against each and every city and county government defendant requiring that available off-duty uniformed city police or deputy sheriff officers be allowed and assigned for duty at OWC upon request for such security and protection.

### PRIVACY, FACE and FDPPA INJUNCTIONS

(2)  Preliminary and permanent injunctions barring the Martin and Raney defendants from copying, writing down, logging, recording, inputting, transcribing, memorizing, and/or memorializing in any form whatsoever any vehicle identifying license plate number, telephone number, FAX number, E-mail address, and/or any other potentially identifying characteristic in, on, or of a vehicle and/or any of its occupants, within 1500 feet of any property line of OWC.

(3) Preliminary and permanent injunctions barring each and every Martin/Raney  defendant from possessing and/or allowing in his or her proximity any camera of any kind or size, video or

audio recording device or instrument of any kind or size, binoculars, telescope, visual magnifying device, microphone that is capable of recording audio transmissions and/or conversations, computer large or small, word processor, typewriter, gun, rifle, knife, machete, noxious or toxic chemical, bacteria, virus, and/or other dangerous weapon or substance within 1500 feet of any property line of OWC.

(4) Preliminary and permanent injunctions barring the Martin/Raney defendants from accessing, or attempting to access in any way, distributing or attempting to distribute or disseminate in any way, directly or indirectly, personal information about any person associated with OWC, its staff, patients, physicians, owners, service people, employees, independent contractors, and/or vendors, from any record of any kind, public or private, maintained, or provided to another person or entity, by any agency of the State of Florida, or of the United States, or any information gathering source whatsoever, including accessing by any Martin/Raney defendant of personal information from CompuServe, AOL, TML, and/or any other Network, Internet, or World Wide Web site, information, or database service.

(5) Preliminary and permanent injunctions prohibiting any and all Martin/Raney defendants from destroying, defacing, concealing, and/or disseminating in any way, any information whatsoever in their actual or constructive possession, pertaining to any past or present OWC patient, patient companion, visitor, physician, staff person, owner, service person, vendor,

independent contractor, and/or employee, said injunction requiring each person served therewith to surrender, provide, and turn over all originals and copies in any form of any such information to an individual designated by the Court, with full hard copies, 8.5 x 11 in. white, of all such information being also provided at the same time to counsel for OWC.

## UNWANTED CONTACT INJUNCTIONS

(6) Preliminary and permanent injunctions prohibiting Ed Martin, and Meredith Raney, and any and all Martin/Raney defendants, from sending or dispatching, directly or indirectly, any unsolicited mail, FAX, E-mail, written or printed matter, package, and/or other material, device, or substance to OWC, any physician, staff, patient, suspected patient, patient companion, invitee, and/or associate of same, without prior approval of the Court, on motion with reasonable notice of at least fifteen days.

## HARASSMENT AND INTIMIDATION

(7) Preliminary and permanent injunctions prohibiting Martin, Raney, and any and all Martin/Raney defendants, from telephoning, E-mailing, FAXing, harassing, intimidating, touching, assaulting, following, stalking, surveilling, contacting or attempting to contact, the OWC facility, any OWC patient, past-present-or future- patient companion, physician, staff member, employee, vendor, invitee, or independent contractor, from or at any place whatsoever, or at the  OWC vicinity, and/or at any place of residence or business or other activity of any such person, except as otherwise provided hereafter.

(8)  Preliminary and permanent injunctions prohibiting Martin, Raney, and any and all Martin/Raney defendants, their class(es), those acting in concert or participating with them, and any persons having actual or constructive notice of the injunction, from (a) entering the premises or property of OWC, (b) blocking, impeding, obstructing, or delaying access, ingress, or egress, to or from OWC premises, and/or buffer zone areas where entry is sought by authorized person(s), (c) gathering, congregating, picketing, purporting to counsel, demonstrating, patrolling, walking about, and/or entering that portion of public right-of-way within 75 feet of the OWC property line. This prohibition bars the Martin/Raney defendants and all notified persons from crossing the Pine Avenue highway or any side street onto the OWC property, sidewalks, driveways, side street, and adjacent sidewalks uninvited by OWC or police authorized persons at any time. It does not apply to owners or invitees of private property adjacent to OWC using said property for purposes unrelated to surveilling OWC. It does prohibit any and all Martin/Raney defendants from spying, surveilling, photographing, and video taping from private property adjacent to OWC in any direction based upon the need to prevent invasions of privacy and security.

## "FIGHTING WORDS"

(9)  Preliminary and permanent injunctions prohibiting Martin, Raney, and any and all Martin/Raney defendants, from yelling, shouting, screaming, the use of "fighting words" such as "butcher," "baby killer," "murderer," "killer," "abortionist," "killing place," "abortuary," "abortion mill," "death," "killing,"

and similar expressions, and/or any form of noise-making, individually or artificially, above a reasonable conversational level, within 1500 feet of the AWCC property line, and further from displaying any signs, images, or symbols bearing any of said inflammatory, "fighting words" expressions.

## HIGHWAY TRAFFIC HAZARD

(10) Preliminary and permanent injunctions prohibiting Martin, Raney, and any and all Martin/Raney defendants, from being in the area on any side of the road within 15 feet of the traffic on Pine Avenue, and 1500 feet of the OWC property line, except when traveling through the area to some other destination, or as otherwise authorized herein. This provision intends to keep defendants safely away from traffic when within 1500 feet of the OWC facility, and to prevent further accidents.

## TIME, PLACE, MASS, AND SIGN LIMITS

(11) Preliminary and permanent injunctions prohibiting any more than five (5) persons from assembling in any part of any property adjacent to OWC, except for legitimate social or business gatherings totally unrelated to OWC and  its activities, and limiting said five or fewer person gatherings to a maximum of two each week, with duration of each a maximum of one hour, no carry-overs. Said five or fewer persons are limited to a maximum of two images or signs at any time, measuring no more than 2 x 3 feet, said signs to have no depiction of blood, gore, fetuses, embryos, or parts thereof, or any other visuals reasonably perceived as likely to outrage, shock, seriously upset, or mislead

viewers, and each sign is limited to black & white English or Spanish text, with readable and accurate translation. Each and every sign must bear a disclaimer on any side with any text and in the same Font size, type size & density, and color of print or lettering, which states:

> "MEDICAL ABORTION IS AUTHORIZED
> BY FLORIDA LAW AND
> THE UNITED STATES CONSTITUTION AND
> HAS BEEN SANCTIONED AS SAFE
> BY THE AMERICAN MEDICAL ASSOCIATION"

## MOVING VEHICLE & PERSON ZONE

(12)   Preliminary and permanent injunctions establishing a five foot protective zone of separation for each and every individual, and vehicle, entering or leaving the OWC area, and prohibiting intrusion upon that zone by Martin, Raney, and/or any Martin/Raney defendant, as is reasonable and necessary in light of prior abuses, harassment, and accident potential. See U.S. v Scott, 975 F Supp 428, 431, 432 (D Conn 1997).

## PREVENTION OF CHILD ABUSE RISKS

(13)   Preliminary and permanent injunctions prohibiting the Martin/Raney class of defendants from bringing, directly or indirectly, any individuals with them to the OWC vicinity who are under the age of fourteen years, that is, within 1500 feet of any OWC property line, except for legitimate business, social, or medical purposes totally unrelated to OWC activities. This shall not prohibit any such defendant herself from going to OWC as a legitimate reproductive health care patient or patient escort with

approval of an OWC representative.

## MISREPRESENTATION LIMITATIONS

(14)  Preliminary and permanent injunctions prohibiting Martin, Raney, and any and all Martin/Raney defendants, from purporting to dispense medical advice, and/or from holding themselves out as qualified to give medical advice, in the absence of any qualifying certification or licensure by the State of Florida, which must be shown and displayed by the person dispensing said advice.

## HOME and GARBAGE INVASIONS

(15) Preliminary and permanent injunctions prohibiting Martin, Raney, and any and all Martin/Raney defendants, from approaching within 36 feet of the garbage, trash, refuse, or the like, of OWC, and/or the dwelling or trash of any physician, patient, patient companion, staff person, employee, independent contractor, invitee, and/or vendor of OWC.

## NECESSITY FOR PHONE TRAP

(16) An order authorizing and requiring any telephone service communications company to provide and install upon request one or more phone traps upon any and all phones of OWC, Dr. Pendergraft, physician(s), owners, staff, employees, and/or independent contractors, to detect, record, and monitor any and all incoming calls or communications from whatever origin, and thereby reduce telephone harassment known to have occurred on a large scale in the past wherever Messrs Martin and/or Raney have been operating.

(17) Such other preliminary and permanent injunctive relief as shall appear necessary and appropriate.

## FORFEITURE OF ASSETS

(18)  An order forfeiting to plaintiffs any and all personal and real property and assets used by any defendant directly or indirectly in furtherance of any tortious event adversely affecting any plaintiff or member of plaintiffs' classes.

(19) An order voiding any and all transfers of assets, real and or personal property,  made by any defendant since the passage of FACE in 1994, and designed to conceal or avoid responsibility for damages caused by any of the activities complained of  in this civil action, and further forfeiting said property to plaintiffs.

## WORK ORDERS

(20) Orders directing defendants into real work programs to pay off any and all judgments, and to divert them from further tortious and criminal violations.

## NOTICE AND SERVICE

(21)  An order providing that each and every provision of the injunction shall bind any and all persons having actual or constructive notice thereof, and that notice shall be provided by appropriate signs and warnings in the OWC vicinity, and proof of notice may be made by delivery of said injunction in writing or verbally to any person appearing in the vicinity to be at risk of a

violation of any kind.


## DAMAGES, COSTS & FEES

(22)  All reasonable actual, statutory, and exemplary damages proven by a preponderance of the evidence at trial.


(23)  An order awarding reasonable costs, interest, expert witness fees, counsel fees, reasonable and necessary litigation costs & expenses, and such other appropriate relief as may be proved to be necessary or proper at trial and upon other hearings and submissions.


**RESPECTFULLY SUBMITTED:**

*Roy Lucas*

**Roy Lucas**
**Trial Counsel**
**DC # 153957**
**c/o PO Box 1433**
**Melbourne, FL 32902-1433**
**TEL: 1-407-725-2413**
**FAX: 1-407-725-3847**

**Scott R Rost**
**Wasserman & Walters**
**228 Park Ave North**
**Winter Park, FL 32789**
**TEL: 1-407-539-1140**
**FAX: 1-407-539-1126**


**ATTORNEYS FOR OWC ET AL PLAINTIFFS.**

## EXHIBITS TO COMPLAINT

| P.EX.NO. | NATURE OF EXHIBIT | TAB NO. |
|---|---|---|
| 1 | Special Duty Assignment Order, City of Ocala, Order 235.00 | 1 |
| 2 | Letter, July 10, 1998, Police to Dr P, Denying off-duty assignment | 2 |
| 3 | Letter, August 28, 1998, Dr P to Police | 3 |
| 4 | Letters, September 16, 18, 1998, Ocala City Attorney to Ocala Womens Center | 4 |
| 5 | Letter, July 29, 1998, OWC to Sheriff Ergle | 5 |
| 6 | Letter, August 4, 1998, Sheriff to OWC | 6 |
| 7 | Letter, September 8, 1998, Sheriff to Dr P and Sheriff's Operations Procedures | 7 |
| 8 | Ocala Police Department Alert | 8 |

1

**235.00  SPECIAL DUTY**

**235.01  SPECIAL DUTY ASSIGNMENTS**

Any regular, full time sworn officer of this Department or any sworn member of this Department's Police Reserve may, upon proper application, be assigned to perform Special Duty during that time when he is not performing regular duty assignments for the Department. Each eligible member who desires to be considered for Special Duty Assignments shall notify his immediate supervisor.

**235.05  PROCEDURES**

Any person, firm or organization, desiring the services of an officer for Special Duty, shall make such request to the Secretary to the Patrol Division Commander or in her absence to the Secretary to the Chief of Police. Sufficient information will be solicited for the completion of a Complaint Card including the nature of the service, the date, time, duration, and the name of the person to whom the officer should report. It will also be the responsibility of the person accepting such request, to fill out, in duplicate, the form quoting the fee schedule, assigned officer(s) name(s), when such request involves any function whereby, the City of Ocala enters into any written agreement or contract that requires off duty police officer(s) and signature of the person requesting the off duty officer(s). The original copy of the form will go to the person requesting the officer(s) along with instructions that the form should be displayed to the City Department with which said written agreement or contract is entered upon, and the duplicate will be attached to the Complaint Card. If the request does not involve any written agreement or contract with the City of Ocala, the request and assignment for off duty officer(s) may be handled by telephone and the duplicate form omitted.

A Special Duty Assignment Roster will be maintained in the Office of the Patrol Division Commander and it will be the responsibility of the Patrol Division Commander to place the name and circumstances of a request for assignment on this roster. It will be the responsibility of the Patrol Division Commander or his designate to make assignments according to the circumstances of the request, known capabilities of available officers and in accordance with a prescribed order of assignments insofar as is possible, to insure equity among eligible personnel.

Any member of this Department, while engaged in Special Duty assignments, shall be considered as "on duty" with this Department, as it pertains to his duties and responsibilities, regardless of the source of remuneration for such assignment. In this "on duty" status, such an officer or member is subject to the same rules, regulations, procedures, statutes, ordinances and policies that he would be subject to were he on regular duty assignment. Such officer, while on any Special Duty Assignment, shall perform police functions only and shall refrain from performing on behalf of the employing person, firm or organization, any function which is not a police function.

### 235.10  SPECIAL DUTY COMPENSATION

Any officer or member of this Department who is assigned to perform any Special Duty Assignment, shall be compensated by the complainant at the rate of a minimum fee of forty-five ($45) dollars for each officer on each assignment. Commencing with the fourth hour, an additional fee shall be due and payable, based on fifteen ($15) per hour with actual time computed to the nearest one-half hour. Complainants shall make payment of compensation for Special Duty Assignment directly to the assigned officer at the completion of the assignment.

No regular member of this Department may perform any Special Duty Assignment the duration of which, when combined with the duration of his regular duty, exceeds 12 hours of any 24 hour day, unless specific prior authorization is given by the Chief of Police.

All requests from complainants regarding Special Duty Assignments will be forwarded to the office of the Patrol Division Commander for approval prior to the actual performance of the assignment and subsequent to the assignment of the officer(s) who perform it.

2



# *Ocala Police Department*

July 10, 1998

James Scott Pendergraft, IV, M.D.
Ocala Womens Center
108 Northwest Pine Avenue
Ocala, FL 34475

Dear Dr. Pendergraft:

    I am in receipt of your letter to Deputy Chief Krietemeyer. He forwarded it to me for consideration. I understand you feel you have a business need to employ security personnel. Let me assure you as was explained to you by Deputy Chief Krietemeyer, the Ocala Police Department will be glad to respond to a call from your personnel for police service by having them call 9-1-1. As you are aware, we have met with your security personnel and explained the procedures to report criminal violations or complaints to our Department.

    The Ocala Police Department has no legal obligation to provide off-duty officers to organizations or businesses. Likewise, we neither have a legal obligation to have our personnel employed in an off-duty assignment when they may find themselves involved in adversarial circumstances to which our Department may have jurisdiction to deal with. Accordingly, your request for employment of our off-duty personnel is denied. Should you choose to employ private armed or unarmed security guards you may have them contact us and we will coordinate with them as needed.

Yours truly

Morrey Deen
Chief of Police

*Equal Opportunity Employer*

P EX 2



August 28, 1998

Chief Morrey Dean
Ocala Police Department
P O Box 1270
Ocala, FL   34478

Dear Chief Dean:

Thank you for your letter of July 10, 1998, and subsequently for the Operations Order 235.00 on special duty provision of police officers for security work.

The Ocala Women's Center specifically needs off duty Ocala police for this security work.  Other arrangements are inadequate to the situation.  The Center plainly comes within the terms of Order 235.00 which is nondiscriminatory on its face.  The Center can and will fully comply with all conditions of the Order.

The foreseeable duty conditions are not dangerous nor adversarial, but are more of the minor disorderly, noise, trespassing, and vandalism prevention type, based on extensive prior experience.  You currently assign officers to many and far more difficult and dangerous tasks.  Clinic harassers tend to be nimble and move too quickly for 911 help to be timely.

All the Center asks is for nondiscriminatory treatment in this regard.  To deny this is like zoning us out from equal police treatment.  You may recall that the City of Orlando recently had to pay $325,000 for zoning out a clinic under similar circumstances.  That is not an optimum use of taxpayers' money.

Please consider this carefully and allow us equal treatment.  Also, please send me a copy of the City's liability insurance policy applicable at the present time.  Please respond to this letter within five (5) business days.

Sincerely,


James S. Pendergraft IV, MD

cc:   E. L. Foster, Mayor               Richard A. Kesselring, President PRO TEM     Ken Ergle, Sheriff
      Scott J. Andrews, City Manager    Mary S. Rich, Council President
      Gerald K. Ergle, Councilman       Michael S. Amsden, Councilman
      Michael A. Finn, Councilman       Patrick G. Gilligan, City Attorney

P EX 3

4

# GILLIGAN, KING & GOODING, P.A.

### ATTORNEYS AT LAW
7 EAST SILVER SPRINGS BOULEVARD
SUITE 500
OCALA, FLORIDA 34470

PATRICK G. GILLIGAN
W JAMES GOODING III
WILLIAM ALLAN KING
ROBERT H. McLEAN

TELEPHONE (352) 667-7707
FACSIMILE (352) 867-0237
http://www.webcom.com/gilligan

September 16, 1998

Patricia L. Fulop
Ocala Womens Center
108 N.W. Pine Avenue
Ocala, FL  34475

RE:   Public Records Act Request of September 10, 1998

Dear Ms. Fulop:

Pursuant to your Public Records Act request of September 10, 1998, please be advised that there are no such documents which are responsive to your request.  Because of the nature of your request, I sense that you misunderstand or have misconstrued Chapter 119. Please be advised that the Public Records Act requires that the custodian of the public records permit the public records to be inspected and examined by any person desiring to do so, at any reasonable time, under reasonable circumstances, and under supervision by the custodian of the public records or the custodian's designee.  The Act also allows for copying of such records upon payment of a statutory copying cost.  The Public Records Act does not, however, require information to be given out from public records or to otherwise produce records in a particular form as demanded by the requester.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

GILLIGAN, KING & GOODING, P.A.

Patrick G. Gilligan

PGG:psc

c:      Chief Morrey Deen
E:\CITY\OPD\ltr to Fulop re public rcrds req.doc

PEX 4

# GILLIGAN, KING & GOODING, P.A.

ATTORNEYS AT LAW
7 EAST SILVER SPRINGS BOULEVARD
SUITE 500
OCALA, FLORIDA 34470

PATRICK G. GILLIGAN
W. JAMES GOODING III
WILLIAM ALLAN KING
ROBERT H. McLEAN

TELEPHONE (352) 867-7707
FACSIMILE (352) 867-0237
http://www.webcom.com/gilligan

September 18, 1998

James S. Pendergraft IV, MD
Ocala Womens Center
108 N.W. Pine Avenue
Ocala, FL  34475

RE:     Correspondence of September 15, 1998

Dear Dr. Pendergraft:

I am in receipt of your above-referenced correspondence to Chief Morrey Deen.  In that correspondence you request the City's response to your previous Public Records Act request.  Please be advised that that response was provided on September 16, 1998.  A copy of that response is enclosed hereto.

You also requested a list of the last 3 years of assignments to off-duty uniformed police officers that were not approved.  Please be advised that no such list exists.

Finally, you have requested a copy of the policy that refers to the Ocala City dumpsters.  The "policy" is contained in Chapter 54, Code of Ordinances, City of Ocala.  There are approximately 14 pages in Chapter 54 of the Code of Ordinances.  If you present yourself to the City Clerk, she will gladly copy same for you at 15 cents per page.  You will need to deal with the City Clerk concerning those records in that she is the custodian of same, and not the Chief of Police.  By copy of this letter to the City Clerk, I am requesting that she make available to you for inspection, or copying upon payment of the copying charge, the information you have requested from Chapter 54.

Finally, Chief Deen asked me to reiterate to you that the Ocala Police Department will provide to the Ocala Womens Center the same police protection it provides to all its citizens, including its corporate citizens.  In that regard, please do not hesitate to report any

Letter/J Pendergraft
September 18, 1998
page 2

suspicions you have concerning any possible criminal activity in or around your facility immediately to the Police Department and they will respond appropriately.

Very truly yours,

GILLIGAN, KING & GOODING, P.A.

Patrick G. Gilligan

PGG:psc

Enclosure

c:      Chief Morrey Deen
        Deborah Bullock, City Clerk
\\GKSERVER\E\CITY\OPD\ltr to Pendergraft re dumpsters.doc





**James S. Pendergraft, M.D.**

108 N.W. Pine Avenue
Ocala, Florida 34475

**352-401-9288**
Fax: 352--401-7657
Out of Area Call Toll Free:
1-877-Ocala First
(622-5234)

http://www.womenscenter.com

*Ocala*
*Womens Center*

July 29, 1998

Marion County Sheriff's Department
Sheriff Ken Ergle
PO Box 1987
Ocala, FL 34478

Dear Sheriff Ergle:

Pursuant to the Marion County Sheriff's Department policy, the Ocala Women's Center hereby formally requests that a Marion County off-duty uniformed Deputy be assigned to the Ocala Women's Center for the purpose of providing security on behalf of the Center and its patients.

Please be advised that we have requested the services for an off-duty officer from the Ocala Police Department; however, our requests for security have been summarily denied.

Sincerely,

*Patricia L. Fulop*

Patricia L Fulop
Administrator

P EX 5





# SHERIFF
## Marion County

August 4, 1998

Ocala Womens Center
Patricia Fulop
108 N.W. Pine Avenue
Ocala, Florida 34475

    RE: SPECIAL-DETAIL REQUEST

Dear Ms. Fulop:

Your request that an off-duty uniformed deputy be assigned to the Ocala Women's Center for the purpose of providing security is denied. If you believe additional security is necessary at your Center, you might want to explore the possibility of contracting with a private security company.

    Sincerely,

    KEN ERGLE, SHERIFF

By: _____
    Major Woody Guess
    Patrol Division Commander
    Marion County Sheriff's Office
    Post Office Box 1987
    Ocala, Florida 34478

G/m

*Ken* Ergle, **SHERIFF**

P Ex 6





**Marion County**

September 8, 1998

James S. Pendergraft, M.D.
Ocala Womens Center
108 N.W. Pine Avenue
Ocala, Florida 34475

　　　　RE: SPECIAL DETAIL REQUEST

Dear Dr. Pendergraft:

I am in receipt of your letter dated September 1, 1998.  Once
again, your request to hire an off-duty deputy for security
work is denied.  Because the Ocala Womens Center is located
within the city limits of Ocala, any requests for additional
security should be made to the Ocala Police Department.

Additionally, your request appears to be pursuant to Florida
State Statute Chapter 119; therefore, I have enclosed copies
of the Procedural General Orders pertaining to off-duty
officers and a brief explanation of our self-insurance
program.

　　　　　　　　Sincerely,

　　　　　　　　KEN ERGLE, SHERIFF

E/m

*Ken* Ergle, *SHERIFF*

P.O. Box 1987, Ocala, FL 34478
Ph. (352) 732-8181
Civil (352) 620-3606 • Emergency Management (352) 622-3205 • Jail (352) 351-8077

P EX 7



904-620-7209   M-50

**SHERIFF**
**Marion County**

OPERATIONS
PROCEDURE

---

## 4685.00 ADDITIONAL LAW EN-FORCEMENT SERVICE

A. It is the policy of the Marion County Sheriff's Office to provide law enforcement services beyond normal services for special requests where vested law enforcement powers are desired, and when requesters compensate the Agency for the additional services.

B. The Sheriff's Office is not obligated to provide additional law enforcement service. The service is provided, however, as an extension of the duties of the Sheriff. The service also affords opportunities to employees of the Agency to work additional law enforcement services within the scope of their training and duty assignment, hereinafter called "Special Details."

C. Deputies may not engage in outside law enforcement activities on their own. All Special Detail requests shall be referred to the Special Detail Coordinator.

## 4685.10 PROCEDURES

A. Processing of Special Details will be the responsibility of the assigned Special Detail Coordinator.

B. Hourly rates for employees are established by the Sheriff of Marion County. The minimum charge for any permit shall be the amount applicable for three (3) hours service, per employee, including cancellations not received within 24 hours.

  1. A fee, plus mileage, shall be charged for each authorized vehicle used to fulfill a permit assignment which requires a vehicle for patrol purposes.

  2. Hourly charges and locations for assignments will be made from the starting and ending place and time specified by the permit holder.

  3. Charges may be reduced or waived by the Sheriff for approved charities. Employees may also volunteer to participate, without compensation, in an approved activity such as Jerry Lewis Telethon, March of Dimes Walk-A-Thon, or similar charity benefit, subject to prior approval by the Sheriff or Bureau Chief.

  a. Deputies will be compensated through the Agency and shall not accept any compensation from the permit holder.

## 4685.10 DEPUTY PARTICIPATION

A. To be eligible to work Special Details an employee must be a certified deputy sheriff, working or having previously worked in a law enforcement capacity within the Agency.

  1. Deputies who are on light duty or part-time duty due to medical conditions will not be permitted to work Special Details until such time as they are medically released for full law enforcement duties.

B. Deputies are prohibited from leaving their assigned zone or duties early for the purpose of off-duty employment.

C. If a deputy accepts a special detail assignment, he or she is responsible for working the detail. If he or she cannot work the detail, it is his or her responsibility to find a replacement.

  1. If a deputy accepts a special detail and fails to work it or to find a replacement, he or she shall be suspended from further working special details for a period of six months.

  a. Suspension from working special details shall not be considered disciplinary action, and a record of such suspension will not be placed in the deputy's personnel file, nor will it be used against the deputy on a performance evaluation.

D. Deputies must arrange special detail assignments for themselves only, and are not allowed to make arrangements for other deputies.

E. Signing up for details shall be considered assignment. Once a deputy has been assigned, the deputy will not transfer his or her assignment to another deputy without first notifying the Special Detail Coordinator. If the Special Detail Coordinator cannot be contacted, a supervisor may give permission but the deputy must notify the Special Detail Coordinator of this change as soon as possible.

F. Deputies will act within the scope and course of official duties while fulfilling permit assignments. The permit holder is restricted to the general assignment of duties only.

---

☆

Revised: 4/10/97

4685.00-1





## Ocala Police Department

**Strategic Investigations**
**Lieutenant Fred Duryea**
**Detective Russ Kern**
**Phone: 352-629-8488 Fax: 352-629-7167**

# Intelligence Bulletin



| | | | |
|---|---|---|---|
| Name | **THOMAS, VINCENT BRONSON** | | |
| DoB | **04/11/70** | | |
| Race | **WHITE** | Sex | **MALE** |
| Height | **6' 1"** | Weight | **160** |
| <u>Hair</u> | | | |
| Color | **BROWN** | Length | **LONG** |
| Style | **STRAIGHT** | | |
| <u>Eye</u> | | | |
| Color | **BLUE** | Glasses | **YES** |
| <u>Facial</u> | | | |
| Hair | **NONE** | Complxn | **LIGHT** |
| Teeth | **-** | | |
| <u>Body</u> | | | |
| Build | **MEDIUM** | | |

Vincent Bronson Thomas is a missing person from Ormond beach Fl. Mr. Thomas has recently made statements about coming to the Ocala area to save aborted babies. The mental condition of Mr. Thomas is listed as questionable by his own mother. If contact is made please contact Detective Steve White with the Volusia County Sheriff's 904-676-4182. Subject was entered in NCIC as Missing / Endangered person by Volusia Co.

# ..Confidential - For informational purposes only..

P Ex 8