# UNITED STATES DISTRICT COURT
## Middle District of Florida
### Ocala Division

OCALA WOMEN'S CENTER, INC.,
a Florida corporation, and
JAMES S. PENDERGRAFT, M.D.,
on their own behalves and for the class of
patients, staff and associated physicians,

        Plaintiffs,

v.

CITY OF OCALA, et al.
        Defendants.

Case No. 98-371-Civ-Oc-10C

## CITY OF OCALA AND MORREY DEEN'S REPSONSE TO PLAINTIFFS' MOTION FOR FURTHER PRELIMINARY INJUNCTION AND INTERIM ATTORNEY'S FEES

Defendants', the City of Ocala and Chief of Police, Morrey Deen, through their undersigned counsel, hereby respectfully requests that this Court deny Plaintiff's Motion for Further Preliminary Injunction and Interim Attorney's fees, and in support thereof provide this memorandum of law.

### Factual and Procedural Background

Ocala Women's Center, Inc., ("OWC") operates an abortion clinic located in the City of Ocala. Plaintiff, Dr. James S. Pendergraft, owns and operates the clinic. It opened for business in July, 1998. Shortly thereafter, OWC requested that Ocala Police Chief, Morrey Deen, authorize the use of "special duty" officers ("SDO") to work as security at the clinic. Chief Deen denied the request because he believed that the use of officers for special duty at an abortion clinic would be viewed as "taking sides" in an emotionally charged and divisive social issue. He also believed that such use of his officers would seen as pitting his officers against protesters that were not violating the law, but rather exercising constitutionally

guaranteed rights. Such a posture could subject his department to distrust, and possibly civil actions from the protesters and/or the clinic.

Plaintiffs' action alleges violations of the Civil Rights Act, 28 U.S.C. §1343; the Freedom for Access to Clinic Entrances Act, 18 U.S.C. §248 et. seq. and the FDPPA, 18 U.S.C. §2721 et. seq. Additionally, Plaintiffs alleged that relief is authorized under 42 U.S.C. §1983-1988 for equal protection, civil rights and due process violations of the Defendants and allege multiple violations of federal and state privacy rights, affliction of emotional distress, interference with business and professional relationships, interference with business and professional reputation and good will, and a civil conspiracy action. Plaintiffs seek to recover compensatory and exemplary damages, and costs and attorney's fees. Finally, Plaintiffs' requested preliminary and permanent injunctive relief.

The preliminary injunction motion was heard on April 2, 1999. This Court issued its injunction order on April 26, 1999, and as to these Defendants granted preliminary injunctive relief in favor of the Plaintiffs. The Court's order required the City of Ocala to provide SDO's to the Plaintiffs "subject to the usual rules and practices with other businesses and organizations as to payment for such government services and accommodation."

Consistent with that order, these Defendants provided, and continue to make available, to OWC the required Special Duty Officers. In the meantime, the Ocala Police Department amended the Special Duty Officer program requirements and as part of that process required of its users a formal written contract between the City of Ocala and any SDO requester. That contract was sent to Plaintiffs. It was also sent to all other businesses and organizations that were currently using SDO's and will also be used for all future requests.

)                                                                    )

On May 15, 1999, an Ocala Police Department officer was deployed to OWC as requested, even though no contract was executed and no reason for failure to sign such was given. OWC failed to pay for the services rendered and thereafter failed to provide an executed contract.[1] No reason for either had ever been given until receipt of the Plaintiffs' instant motion.

It appears from the Plaintiffs' motion that counsel has concluded that the contractual provisions in the SDO contract somehow affect their rights in the instant litigation. This is not the case. The current litigation stands on its own and whatever rights and privileges Plaintiffs enjoyed at the outset of this litigation they will continue to enjoy after the contract is executed. The contract provisions are those that govern the parties insofar as they deal with the employment of SDO officers at the Plaintiffs clinic, not the current litigation. It should have been plainly obvious that was the case,[2] and had counsel inquired about these issues he would have been reassured of this fact, thus obviating the need for this motion. If, on the other hand, Plaintiffs are seriously contesting the City's entitlement to insist on routine contractual provisions prior to hiring SDO's, applicable to all users, then the motion is frivolous and should be dealt with accordingly.

### New SDO Fee Structure and Procedures

Although not technically made an issue, Plaintiffs gripe in their motion about the increased fee structure charged by the Ocala Police Department and imply to these Defendants sinister motives for the increase. The accusation is false. As shown by the attached affidavit of Chief Morrey Deen, the new fee structure is based on a "break even"

---

[1] As of this date, Plaintiffs have still not paid for the service provided on May 15, 1999, despite written requests that it do so. See attached correspondence dated May 26, 1999, attached hereto as Exhibit "1".

[2] For example, the jury waiver provision talks about "any civil action ... which arises out of, concerns, or relates to this agreement, any and all transactions contemplated hereunder, the performance hereof, or the relationship created hereby, whether sounding in contract, tort, strict liability, or otherwise, trial shall be to a court of competent jurisdiction and not to a jury."

cost analysis for the City to pay their SDO's.[3]  The new rate is $28 per hour as opposed to the

previously charged $20 per hour. This is only slightly more that the $25 per hour currently

charged by the Marion County Sheriff's Department. Most importantly for purpose of this

motion, it is the same rate charged to anyone requesting SDO's.

This Court in its injunction order against these Defendants noted a lack of written

policies as a basis for disapproval by the Chief of Police of an SDO assignment request.[4]

Accordingly, a top to bottom review was done of the program and as a result new policies

and procedures were adopted and a formal contract developed for users of SDO services. The

policy and the contract are the same for all users. The most significant change, was the

decision to bring the hiring of the SDO's completely "in house" meaning that the users

would no longer pay the officers directly, but rather pay the service fee to the City which

would in turn pay the SDO.[5]  Because of this change, the City was is required to pay its

SDO's in compliance with the wage and compensation laws.  The rate of $28 per hour was

determined to be appropriate and necessary given these factors.

### Jury Trial Waiver

Plaintiffs first complain that the jury waiver provision violates the seventh and

fourteenth Amendments. This is not true. The provision in question states:

> **Jury Waiver**: In any civil action, counterclaim, or proceeding, whether at
> law or in equity, which arises out of, concerns, or relates to this agreement,
> any and all transactions contemplated hereunder, the performance hereof,
> or the relationship created hereby, whether sounding in contract, tort, strict
> liability, or otherwise, trial shall be to a court of competent jurisdiction
> and not to a jury.  Each party hereby irrevocably waives any right it may

---

[3] As shown by the affidavit of Chief Deen (attached hereto as Exhibit "2"), the break even rate is a
"blended rate" which attempts to charge on rate which on average will be a break even proposition. This is
necessary because different officers get paid different rates based on rank and seniority.
[4] The City disputes this factual finding by the Court, but nevertheless concedes that more specific
procedures would at least lend clarity to the program and its procedures.
[5] This is the procedure used by the Marion County Sheriff's Department.

have to a trial by jury.  Any party may file an original counterpart or a copy of this agreement with any court, as written evidence of the consent of the parties hereto of the waiver of their right to trial by jury.  Neither party has made or relied upon any oral representations to or by any other party regarding the enforceability of this provision.  Each party has read and understands the effect of this jury waiver provision.

Contrary to the naked assertions of Plaintiffs as to their unconstitutionality, contractual jury waiver clauses are an acceptable and enforceable contract clause in both federal and Florida legal jurisprudence. See, *Tellum, Inc. v. E.F. Hutton Credit Corp.*, 859 F.2d 835 (10th Cir. 1988); *Leasing Service Corp. v. Crane,* 804 F.2d 828 (4th Cir. 1986); *Palomares v. Ocean Bank of Miami*, 574 So.2d 1159 (Fla. 3rd DCA 1991); *Vista Centre Venture v. Unlike Anything, Inc.*, 603 So.2d 576 (Fla. 5th DCA 1992); *Gelco Corp. v. Campanile Motor Service, Inc.*, 677 So.2d 952 (Fla. 3rd DCA 1996).

The Plaintiffs obviously don't like this contract clause, but it is no different than any other clauses in that it is a condition of service that all other users of SDO's are being required to accept as a condition of employment.

### Venue Waiver

Next, Plaintiffs oppose the venue provision of the contract claiming it violates the Supremacy Clause of the U.S. Constitution. This is not true. The provision in question states:

**Jurisdiction and Venue**:  The parties acknowledge that a majority of the negotiations, anticipated performance and execution of this Agreement occurred or shall occur in Marion County, Florida.  Any civil action or legal proceeding arising out of or relating to this Agreement shall be brought only in the courts of record of the State of Florida in Marion County or the United States District Court, Middle District of Florida, Ocala Division.  Each party consents to the exclusive jurisdiction of such court in any such civil action or legal proceeding and waives any objection to the laying of venue of any such civil action or legal proceeding in such court or the right to bring an action or proceeding in any other court. Service of any court paper may be effected on such party by mail, as

provided in this Agreement, or in such other manner as may be provided under applicable laws, rules of procedure or local rules.

Like Plaintiffs' complaint concerning jury waiver, this contract clause is also a very common contractual provision allowed under both Florida and federal jurisprudence. See, *Burger King Corporation v. Rudzewicz,105 S.Ct. 2174 (1985) fn. 14 and cases cited therein, Honea v. Walker Chemical & Exterminating Co., Inc.,393 So.2d 1210 (Fla.5th DCA 1981); Hauck v. Triana Custom Homes, Inc.,467 So.2d 707 (Fla. 5th DCA 1985);Carlson-Southeast Corporation v. Geolithic, Inc., 530 So.2d 1069 (Fla. 1st DCA 1988);Intercapital Funding Corporation v. Gislair, 683 So.2d 530 (Fla. 4th DCA 1996);Vacation Ventures, Inc. v. Holiday Promotions, Inc., 687 So.2d 286 (Fla. 5th DCA 1997); Professional Planning Services, Inc. v. Sunshine Staff Leasing, Inc., 695 So.2d 883 (Fla. 5th DCA 1997).*

Once again calling something unconstitutional and coercive does not make it so. Plaintiffs offer no specific legal support for their contention and apparently simply want this Court intervene and structure the City's contract consistent with Plaintiffs' notions of constitutionality. This the Court should not do. If the City is going to offer a service, which it has no constitutional, statutory or common law obligation to provide, then it should be free to provide that service pursuant to contractual requirements it deems necessary, so long as they are required of all on an equal basis.

Legality's aside, it is puzzling why the Plaintiffs would even object to this given that venue would naturally arise in a Ocala court in any action arising out of the proposed contract by operation of law. The contract is for SDO police services provided by the City of Ocala, to a business located in the City of Ocala, pursuant to a contract entered into in the City of Ocala and where payment for such services would be due in the City of Ocala. See

e.g., Chapter 47, Florida Statutes, concerning venue requirements. Finally, the venue

requirement provides for venue in this very court!

## Governing Law Requirement

Plaintiffs next object to the "Governing Law" provision in the proposed SDO

contract. That provision reads as follows:

> **Governing Law**:  This Agreement is and shall be deemed to be a contract
> entered into and made pursuant to the laws of the State of Florida and shall
> in all respects be governed, construed, applied and enforced in accordance
> with the laws of the State of Florida.

Governing law provisions are common, acceptable and enforceable under both

federal and State law. See, *National Equipment Rental, Ltd. v. Szukhent, 84 S.Ct. 411(1964);*

*Coral Gables Imported Motorcars, Inc. v. Fiat Motors of North America, Inc., 673 F.2d 1234*

*(11th Cir. 1982); Continental Mortgage Investors v. Sailboat Key, Inc., 395 So.2d 507 (Fla.*

*1981); Burroughs Corporation v. Suntogs of Miami, Inc., 472 So.2d 1166(Fla. 1985).*

Plaintiffs argument that omission of "federal laws and Constitution is omitted,

deliberately, and in municipal show of disrespect for the federal courts and federal system" is

just silly and leaves one baffled as how the Plaintiffs inferred and "intention" on behalf of an

entity, little less and intention to be disrespectful.[6] Nevertheless, Florida law is not a foreign

law divorced from the U.S. Constitution and federal law. It is absurd to suggest same.

## Indemnity Requirement

Finally, the Plaintiffs' complain that the City can not require of it (or presumably the

other users of SDO services) that it be indemnified and held harmless. The SDO indemnity

clause states:

**Indemnity**: Requester agrees to indemnify and hold harmless City and any SDO assigned pursuant to this agreement from any and all actions for liability for claims, suits, actions, damages or causes of action for money damages against it for injury or loss of property, personal injury or death caused by the negligent or wrongful act or omission of any Special Duty Officer employed by the City while acting within the scope of his office or employment in accordance with the general laws of this state, arising from or during the Special Duty Officers employment by Requester. This indemnity agreement includes any and all costs and attorney's fees incurred by the City in defense of any claims against it or the SDO.

Indemnification clauses are not only a proper contractual terms, but are enforceable by both Florida and federal courts. See, *Florida Power and Light Company v. Mid-Valley Inc., 763 F.2d 1316 (11th Cir. 1985); United Parcel Service of America, Inc., v. Enforcement Security Corporation, 525 So.2d 424(Fla.1st DCA 1987); Etiole International N.V. v. Miami Elevator Company Inc., 573 So.2d 921 (Fla. 3rd DCA 1991);*

In the instance of providing discretionary police services for a fee, indemnity agreements are a necessity. The City of Ocala and its police officers are the target of frequent and unfortunately now commonplace lawsuits which arise out of police activities. This is not unique to Ocala, as many law enforcement agencies in the state and around the country are quite aware. It is also the natural consequence of police business. It breeds civil litigation. Frequent and sometimes unwanted contact with the public, high visibility, arrest powers, high speed chases, gun play, crime and its prevention, and other myriad factors contribute to an explosion of lawsuits and claims against the police. These claims, including unwarranted claims, pose a significant financial and manpower drain on police departments everywhere. They are a fact of modern police business. Consequently, steps can and should be taken to mitigate the costs of these claims wherever possible. Indemnity and hold harmless

---

[6] The contract was drafted by the undersigned. This clause is one of many "boilerplate provisions" used in many City contracts which the City considers to be valuable. Any "intentions" would, ipso facto, have also

agreements are a part of this legitimate strategy.[7] That is especially true where, as here, the police department exposes itself to increased liability claims by offering the SDO program, and does so with no anticipation of making a profit for this service.

In this case, providing SDO's to Plaintiffs without an indemnity agreement would border on legal malpractice given two facts. First, the Plaintiffs have declared an all out legal war on the clinic protesters. Their pleadings are shrill and filled with invective and pejorative terms when describing the protesters. Disturbingly, they lampoon their religious beliefs.[8] They loosely accuse the protesters of criminal acts and conspiracy to commit those acts. They attribute to them schemes, plans or desires for murder, mayhem, arson and other forms of domestic terrorism. And they have done this without offering one iota of proof other Dr. Pendergraft's verification that these things are true.

The Ocala Police Department, on the other hand, which is charged with investigating, and preventing where possible, these potential crimes has never received from these Plaintiffs any evidence of these crimes or any request to investigate its allegations. Something is terribly amiss where the very police department that is so urgently required to protect the Plaintiffs from the asserted criminality of the protesters, has never offered evidence to the police that the criminal acts they require protection from are occurring or likely to occur.[9]

---

been intentionally expressed in countless previous City contracts. Assuredly, this was not the case.

[7] In many City contracts an insurance procurement clause naming the City of Ocala as and additional insured is required when the City deems itself at risk. Although not asked for here it is also a legitimate contractual provision.

[8] The protesters are repeatedly referred to as "fundamentalist". The religious persuasion of these Defendants is unknown, but should not matter.

[9] This is even more suspicious, where, if true, Plaintiffs apparently offered to not come to Ocala and open a abortion clinic to Defendant, Martin, for $800,000.00. This is significantly at odds with the high-minded claims of the Plaintiffs and the patients they claim to represent and looks unseemly given that the this lawsuit followed. See, to date uncontroverted affidavit of Ed Martin filed on or about April 5, 1999.

The second reason that an indemnity agreement is necessary is that the protesters believe that the Plaintiffs as performing a monstrous evil. Their protests reflect this belief, and sometimes there protests, like the Plaintiffs' pleadings, are also shrill. Their is no reconciling their beliefs with the actions of the Plaintiffs. On top of this, these Defendants have been informed that the presence of SDO's may well cause litigation against them should the protesters come to believe that their rights have been infringed upon.[10] Given this, the City of Ocala has quite logically insisted upon indemnity.

### Vagueness Argument

Plaintiffs state that OWC cannot sign the SDO Agreement because certain terms contained therein are impermissibly vague. Defendants are unaware on any precedent that allows courts to scrutinize a contract prior to its entry for flaws, defects, vagueness or impermissible clauses. Rather, the courts job is to enforce the contract if legal, and interpret it if a dispute arises about its enforcement. If the contract is vague as claimed by the Defendants, then the Court can deal with that issue if and when an issue relating to the contract becomes actionable.

Plaintiffs cite two Supreme Court decisions in support of their argument. These cases, however, deal with an unconstitutionally vague state statute and municipal ordinance, not a contract. The cases highlight the fact the vagueness may invalidate a criminal law for either of two independent reasons. First, the law may fail to provide the kind of notice that will enable the average person to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 S.Ct. 1855 (1983); *Chicago v. Morales,* 119 S.Ct. 1849 (1999).

---

[10] It wouldn't seem that mere beliefs, rather than actual alleged facts would be needed for a lawsuit. Plaintiffs, in their own lawsuit, however, repeatedly base their claims on their own perceptions without the need for actual alleged facts. So there is precedent.

The language at issue here is not contained in a state statute or city ordinance, but rather a contract. There is no state penal code or municipal ordinance at issue which sets up an arbitrary standard of prohibited conduct without alerting the populous of what that conduct is. This is a contract for citizens entering into agreements with the City to hire SDO's in which it outlines the rights and duties of the parties.

The plaintiffs take issue with the language contained in paragraph 3(d) requiring a Requester to "[r]efrain from directing the actions of any Special Duty Officer(s) during the Special Duty Officer(s) time of employment." Plaintiffs argue that "directing" is not defined, is vague and overbroad. Plaintiffs also take exception to the language in Paragraph 3(j), arguing that "unlawful", "unruly", and "confrontation" are similarly vague. Plaintiffs also claim Paragraph 3(l) which requires the Requester to "[r]efrain form engaging in any activity that is designed to inflame or incite others" is impermissibly vague.

Yet, given the particular type of contract at issue, the language is not vague or overbroad and is particularly appropriate. Furthermore, despite whatever parallels the Plaintiffs infer from *Morales* and *Chicago*, those cases simply do not hold that vague or overbroad language contained in a agreement between a city and a third part is unconstitutional. Interestingly, those cases do acknowledge that a certain degree of police discretion is necessary to allow the police to "perform their peacekeeping responsibilities satisfactorily."[11]

The Plaintiffs real concern about these provisions is that OWC will not be able to direct and control the SDO's, not that their actions have been arbitrary or discriminatory or that the SDO's enjoy too much discretion. While Plaintiffs are responsible for the payment of the SDO's under the agreement, they are not their employers and the SDO's are certainly not their agents.

---

[11] See Justice O'Connor's and Breyer's concurring opinion in *Chicago v. Morales* 119 S.Ct. 1849, 1862 (1999).

The SDO's are there to enforce the law; period. They are not a tool of harassment for the Plaintiffs.

Plaintiffs suggestion that "directing" is so overbroad that it could encompass "legitimate suggestions" and "requests" is legalistic hairsplitting. Not only would the average reasonable person find little difficulty differentiating those actions from each other, but this is not a criminal statute which subjects a party to criminal prosecution should a "forceful suggestion" be uttered by a party.

The very nature of the SDO's police presence requires that they perform their duty as peace-keepers in a unbiased, neutral manner independent from the control of third parties. OWC's payment to the City for the SDO services does not entitle OWC to order and direct the SDO's as they see fit. As Justices Thomas and Scalia pointed out in *Chicago*, that by empowering police to act as peace officers the law assumes that they will exercise discretion responsibly and with sound judgment, however in order to perform their peace-keeping responsibilities satisfactorily, the police inevitably must exercise discretion. *Chicago* at 1883. This discretion would be lost if they are put in a position where a party has the right to "direct" their actions.

To date, Plaintiffs have made no allegations that the SDO hired by the Plaintiffs performed his duty as a police officer arbitrarily or in any manner inconsistent with the duties and responsibilities of same. Plaintiffs have chose to not utilize the available SDO's since, which would seem to be a irrational decision given their use could have been used to document all the alleged "deficiencies" of the agreement. In short, Plaintiffs have raced back into federal court challenging the agreement provisions without testing the waters and seeing if any example of arbitrary or discriminatory action ever arise. Just as facial challenges of arbitrary or discriminatory enforcement of ordinances are best addressed when, and if, they arise rather than prophylactically through the disfavored mechanism of a facial challenge on vagueness grounds,

so to is this challenge to the SDO agreement in the instant case. See *United States v. Salerno*,

107 S.Ct 2095 (1987).

### Motion for Interim Attorney Fees Pursuant to §1988

Plaintiffs have asked for interim attorney fees pursuant to §1988 for "all OWC counsel

working on the related issues for OWC in the case."[12]  However, Plaintiffs are not entitled to

interim fees unless they are a "prevailing party" under the law, and even then the fees awarded

must be measured according to degree of the success actually obtained. See, *Farrar v. Hobby*,

113 S.Ct. 566 (1992). Moreover, a prevailing party may even technically prove that their civil

rights were violated yet not receive attorney fees under §1988 because any fees awarded must be

proportionally limited to the actual success achieved as measured by the change in relationship

between the parties.

In the instant case, Plaintiffs are not a prevailing party under §1988.  OWC's only

success on the merits to date stemming from its initial 10 count Complaint is a preliminary

injunction against one defendant.[13]  Moreover, this injunction is the functional equivalent of a

"procedural" or "technical" victory under §1988 because the injunction did not materially

change the relationship between the parties and is insufficient to support prevailing party status

for purpose of attorney's fees.

The SDO presence now available as required under the preliminary injunction order was

never a necessary or integral part of OWC's daily business operations.  Thus, unlike the

preliminary injunctions granted in *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d

328 (5th Cir. Fla. 1981); *Aware Woman Clinic, Inc. v. City of Cocoa Beach*, 629 F.2d 1146 (5th

---

[12] See, Plaintiffs' motion at page 18.
[13] Chief Deen and the City of Ocala are technically one party. A motion to dismiss Chief Deen will be filed after the second amended complaint based on *Busby v. City of Orlando*, 931F.2d 764 (11th Cir. 1991).

Cir. Fla. 1980); and *Jones v. Crew Distributing Co., Inc.,* 984 F.2d 405 (11th Cir. 1993) which significantly changed the relationship between those parties qualifying them for prevailing party status, the injunction has not materially changed the Plaintiffs' position here.[14]

Under 42 U.S.C.A §1988, The Civil Rights Attorney's Fees Awards Act, reasonable attorney's fees may be awarded to a prevailing party in a civil rights action under certain civil rights statutes, specifically including § 1981, 1982, 1983, 1985, and 1986. Federal courts have awarded attorneys fees to prevailing parties at the interlocutory stage of proceedings. However, federal courts have also held that parties who obtain a preliminary injunction but do not ultimately succeed on the merits are not prevailing parties under §1988. *Smith v. University of North Carolina,* 632 F.2d 316 (4th Cir. 1980). Similarly, several federal courts have also concluded that where a plaintiff receives a favorable ruling on the merits of his claim, but that ruling is later vacated or reversed on the merits, the plaintiff is not entitled to attorney's fees as a prevailing party. *Harris v. Pirch,* 677 F.2d 681 (8th Cir. 1982); *Harrington v. Vandalia-Butler Board of Education,* 585 F.2d 192 (6th Cir. 1978). Hence, awarding fees now would be premature.

### Prevailing Party

It is true that in order to be a prevailing party it is not necessary to ultimately prevail on each and every claim asserted or to receive all the relief requested. *Hanrahan v. Hampton,* 100 S.Ct. 1987 (1980). However, the Eleventh Circuit has ruled that the monetary or equitable relief obtained from the court must alter the relationship between the parties. See, *Jones,* 984 F.2d at

---

[14] It is important to remember that these Plaintiffs receive more regular police surveillance and security checks than any other business in the City of Ocala. See, affidavits supplied at original injunction hearing.

407, citing *Texas State Teachers Assn. v. Garland Independent School Dist*, 489 S.Ct. 1486

(1989).

A preliminary injunction has been the basis for establishing prevailing party status under

Federal Civil Rights Statutes, however in those cases the injunction significantly altered the

relationship between the parties because it substantially affected their business operations. Thus,

in *Jones*, the plaintiff proceeding under a similar fee shifting statute[15] obtained a preliminary

injunction that materially altered his legal relationship with the defendant where the injunction

allowed a gas station to resume and maintain business operations through the pendency of the

action after being completely cut off from his supplier. Id. at 408. The preliminary injunction in

*Jones* required the defendant to resume the delivery of gasoline and other petroleum products so

the plaintiff could resume his business operations and start selling gas to customers again. Id. at

407.

In *Deerfield Medical Center* the preliminary injunction required the City of Deerfield

Beach to approve and issue an occupational license to the medical center so they could begin

operations and start recovering their investment. *Deerfield* at 339. The injunction in *Deerfield*

*Medical Center* significantly altered the relationship between the city and the medical center as

the occupational license was an essential requirement for the center to begin business operations.

The plaintiff's in *Deerfield Medical Center* had purchased a building, renovated and equipped it

to provide medical care, but could not begin business operations until the city issued an

occupational license. Id. at 328. Similarly, in *Aware Woman Clinic* the court granted a

preliminary injunction against the enforcement of a city ordinance which established new

---

[15] The plaintiff in *Jones* was proceeding under a different fee shifting statute, however the court utilized the
§1988 prevailing party analysis as stated in *Farrar* and *Garland* to reach its decision that the plaintiff was

licensing requirements and regulation of an abortion clinic. *Aware* at 1147. The City of Cocoa Beach in *Aware Woman Clinic* had unconstitutionally interfered with the business operations of the clinic by selectively limiting the scope of the new ordinance to the clinic solely and requiring compliance with the new licensing and regulation schemes to be able to continue servicing customer thus qualifying the clinic as a prevailing party. Id.

These cases highlight the fact that the injunction must materially change the position of the party in order to be considered "prevailing" under §1988. In *Jones, Deerfield Medical Center*, and *Aware Woman Clinic* the injunction materially affected the business operations of the plaintiffs. Without the injunction, the plaintiffs would not have been able to operate their business, service customers, or recover their investments. In the instant case, the actions of the City did not affect OWC in any material manner. It did not affect the business operations of the clinic or Dr. Pendergraft's ability to recoup his investment in the clinic.

The injunction was a "technical victory" that provided the Plaintiffs the opportunity and right to hire SDO's . It did not allow the clinic to begin their business operations like *Deerfield Medical Center* or resume their business as in *Jones*, or remove stringent licensing requirements to continue operations as in *Aware Woman Clinic*. Furthermore, the Plaintiff's own actions since the Order granting the preliminary injunction evidence the fact the right to hire SDO's does not affect Plaintiffs' business in any material manner. Plaintiff's did not post the minimal $1000.00 bond required until May 12, 1999, thus 16 days had passed since this Court's order. Moreover, the Plaintiffs have utilized this newly acquired right only one time to date.

---

entitled to attorney fees where the preliminary injunction had materially altered the legal relationship between the parties. See *Jones*, 984 F.2d at 408

Yet even if OWC was entitled to prevailing party status, interim attorney fees would not be appropriate due to the limited degree of success achieved at this point. In *Farrar*, Justice O'Connor established the following three part test in her concurring opinion to determine whether a prevailing party achieved enough success to be entitled to an award of attorney's fees:

(1) the difference between the judgment recovered and the judgment sought;

(2) the significance of the legal issue on which the Plaintiff has initially "prevailed"; and

(3) the public purpose served by the litigation.

In the instant case, the judgment recovered to date is negligible compared to the relief asked for in Plaintiffs' voluminous complaint. No damages have been proven or awarded. The requested preliminary injunction is a preliminary vindication of the Plaintiffs' rights, rather than a necessary and material requirement that affects their day to day business operations. The Eleventh Circuit has specifically declined to hold that a " technical victory" coupled with injunction relief will always entitle a party to attorneys fees under a fee shifting statute when the injunctive relief, "considered on the whole, does not effect a 'material' alteration of the legal relationship of the parties . . ." See *Jones at 408*.

Furthermore, the significance of, and public purpose served by this litigation is not the type that entitles the Plaintiffs to attorney fees. The Plaintiffs' litigation has simply resulted in OWC's ability to hire SDO's, a discretionary service provided by the Ocala Police Department. It did not provide to OWC an entitlement to a constitutionally required service. While this Court

did not agree with Chief Deen's rationale for denying SDO's to OWC, it has not been shown that Chief Deen's rationale was arrived at in bad faith or for prejudicial reasons.[16]

Most importantly, there was no controlling precedent to serve as a definite authority to guide the Defendants actions in this case. The particular issue presented in the instant case was a novel one. Chief Deen did not try to circumvent an established fundamental right held by OWC or Dr. Pendergraft and the City and its citizens should not be penalized because of such.[17]

While this Court has preliminarily found Chief Deen's reasons for denying SDO's to OWC did not meet the rational basis test, it nevertheless did apply this lower threshold test in making its legal analysis. On the other hand, Chief Deen believed in good faith that the his policy concerning SDO's was legitimate, functionally important, and lastly rational. And in light of the novelty of the issue, Chief Deen and the City could not reasonably be expected to predict how a court would rule on the same. Finally, it is possible given the low standard applied, that this Court after a complete evidentiary hearing, or an appellate court upon review, may ultimately decide that the City reasoning did meet the rational basis test.

In summary, this litigation was not about a citizen being denied a fundamental right, rather it was a novel issue concerning the City's attempt to avoid entanglement in sensitive political issues, needless litigation and the preservation of the appearance of neutrality. Awarding fees based on OWC's vindication on a preliminary basis would be unreasonable in light of the facts in this case and at this juncture of the case. See, *Naprstek v. City of Norwich*, 433 F.Supp. 1369 (N.D.N.Y. 1977)(where challenge to curfew ordinance was successful but court held "action did

---

[16] Additionally, it should be noted that the Defendants requested an expedited hearing so that if they were wrong in their judgment that the Plaintiffs would be allowed to hire SDO officers sooner rather than later.

)                                    )

not rise to the level of national priority or constitutional dimensions which would justify award

in view of the insignificance of threat to public interest posed by the curfew in question.") See

also *Naduea v. Helgemoe*, 581 F.2d 275 (1st Cir. 1978).

Finally, if attorney's fees are awarded, this Court should limit any award to the work

performed on the issues which were successful. See, *Sethy v. Alameda County Water District*,

602 F.2d 894 (9th Cir. 1979); *Nadeau v. Helgemoe*, 581 F.2d 275, 278-79 (1st Cir. 1978).


### Conclusion

The Plaintiffs motion for further injunctive relief is merit-less and should be denied.

The motion for interim attorney fees should likewise be denied.


I HEREBY CERTIFY that a copy of the foregoing has been furnished by U.S. Mail

to **Roy Lucas, Esquire,** Attorney for Plaintiffs, c/o P.O. Box 1433, Melbourne, Florida

32902-1433; **Scott Rost, Esquire,** Attorney for Plaintiffs, Wasserman & Walters, 228 Park

Avenue North, Winter Park, Florida 32789; **Carol A. Falvey, Esquire,** Attorney for

Defendant Ed Dean, P.O. Box 2720, Ocala, Florida,34478-2720, **Virgil W. Wright, III,**

**Esquire,** Attorney or Defendant County of Marion, Cameron, Marriott, Walsh, Hodges &

Coleman, P.A., P.O. Box 5549, Ocala, Florida 34478-5549; **John W. Jolly, Esquire,**

Attorney for Defendant Ergle, Skelding, Labasky, Corry, Hauser, Jolly, Metz & Daws, P.A.,

P.O. Box 669, Tallahassee, Florida 32302-0669; **Frederick H. Nelson, Esquire,** Attorney

for Defendant Raney, P.O. Box 547503, Orlando, Florida 32854-7503; and **Mathew D.**

---

[17] It would be a different question perhaps had the issue involved a matter requiring a "strict scrutiny" analysis. In that case the Defendants would have been on notice that differential treatment was presumptively suspect. That is not the case with a rational basis test.

**Staver, Esquire,** Attorney for Defendant Martin, 1900 Summit Tower Blvd., Suite 540,

Orlando, Florida 32854, this _13_ day of July, 1999.

GILLIGAN, KING & GOODING, P.A.

BY: _____
Patrick G. Gilligan
7 East Silver Springs Blvd.
Concord Square, Suite 500
Ocala, Florida 32670
(352) 867-7707
Florida Bar No. 375454

E:\CITY\Litigation\Ocala Women's Center\OWC-Response in Opposition.doc

# GILLIGAN, KING & GOODING, P.A.

ATTORNEYS AT LAW

7 EAST SILVER SPRINGS BOULEVARD

SUITE 500

OCALA, FLORIDA 34470

PATRICK G. GILLIGAN
W. JAMES GOODING III
WILLIAM ALLAN KING

TELEPHONE (352) 867-7707
FACSIMILE (352) 867-0237
http://www.webcom.com/gilligan

May 26, 1999

**VIA FACSIMILE (407) 725-3847**

Roy Lucas, Esquire
Post Office Box 1433
Melbourne, FL 32902-1433

RE:    Ocala Women's Center v. City of Ocala, et al.
        Case No. 98-1358-Cv-Orl-18C

Dear Mr. Lucas:

I have been informed that your client has not paid the City of Ocala for the Special Duty Officer (SDO) which was detailed to your client's facility on May 15, 1999.  I was told the officer informed the clinic staff that in the future that SDO's would not be detailed to the clinic without pre-payment and execution of the SDO agreement I had previously sent to you.  To date, we have not received and executed Contract nor has the City of Ocala been paid for the presence of the SDO for May 15, 1999.  Right now, your client owes the City of Ocala $196.00 (7 hours @ $28.00 per hour) for services of the SDO.

I am a little confused given your client's lawsuit to obtain an SDO and their subsequent failure to pay for same.  If your client has chosen to not use SDO's that is certainly their decision to make.  They nevertheless still need to pay for the services already rendered.  I would appreciate it if your client could make immediate payment for the past services rendered and let me know what their intention is as to future services.

Very truly yours,

GILLIGAN, KING & GOODING, P.A.

Patrick G. Gilligan

PGG/knh
cc: Chief Morrey Deen
\\Gkserver\e\CITY\Litigation\Ocala Women's Center\letter to lucas 5_26.doc

EXHIBIT

"1"

UNITED STATES DISTRICT COURT
Middle District of Florida
Ocala Division

OCALA WOMEN'S CENTER, INC.,
a Florida corporation, and
JAMES S. PENDERGRAFT, M.D.,                    Case No. 98-371-Civ-Oc-10C
on their own behalves and for the class of
patients, staff and associated physicians,

          Plaintiffs,

v.

CITY OF OCALA, et al.

          Defendants.
_____/

## AFFIDAVIT OF MORREY DEEN

       I, Morrey Deen, make the following Affidavit upon my personal knowledge of the

facts known to me concerning this matter:

1.       I am the Chief of Police for the Ocala Police Department.  I was appointed to that
position by the City Council for the City of Ocala on February 8, 1995, and have served
continuously in that position since that date.

2.       I determined that the Special Duty Officer program required a review.

3.       One of the biggest concerns was that although the officers, when assigned, were
"on-duty" and subject to the control of the Police Department, they were being paid
directly by the requester.  I personally contacted the Marion County Sheriff's Department
to determine how they conducted their program. The Sheriff's Department gets paid by
the user and in turn pays their officers.  The Sheriffs office is currently charging $25 per
hour for their services. I also sought counsel from my subordinates and City staff.  I
determined that the program should be run financially through the City of Ocala. This
would require compliance with wage and hours laws and the police collective bargaining
agreement and as a consequence a financial restructuring of the program.

4.       I worked with the City Finance Director to determine how to do this and to
determine an hourly rate to charge so as to fairly compensate the officer and to make the



EXHIBIT

"2"

program a break even proposition for the City. It was determined that the City should charge $28.00 per hour for its services in order do this.

5.      Prior to the increase the City was charging $20 per hour for SDO services.

6.      I also ordered that the procedures used to employ SDO's be re-evaluated and that those procedures be incorporated into a formal contract with any user of SDO services. That contract is now in use and is required of all persons, businesses and organizations who request SDO services.

7.      On May 15, 1999, the Ocala Police Department provided a SDO to the Ocala Womens Center. Prior to that date a contract was sent to the clinics attorney along with a request for payment. The contract was never executed and the Plaintiffs have so far failed to pay for the SDO.

Further affiant sayeth naught.

_____
Morrey Deen
Chief of Police

STATE OF FLORIDA
COUNTY OF MARION

SWORN TO (or affirmed) and subscribed before me this _9_ day of July, 1999, by Morrey Deen, who is personally known to me or who has produced _____ as identification.

_____
Notary Public State of Florida

_LORI G CRIBB_
Printed

LORI G. CRIBB
MY COMMISSION # CC 680404
EXPIRES: September 15, 2001
Bonded Thru Notary Public Underwriters

SEAL